# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| THE TULALIP TRIBES, and THE CONSOLIDATED BOROUGH OF QUIL CEDA VILLAGE, | No. 2:15-cv-00940-BJR |
| Plaintiffs, | MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF-INTERVENOR'S MOTION FOR ORDER REGARDING GOVERNMENT SERVICES. |
| and | |
| THE UNITED STATES OF AMERICA, | |
| Plaintiff-Intervenor, | |
| v. | |
| THE STATE OF WASHINGTON, Washington State Governor JAY INSLEE, Washington State Department of Revenue Director VIKKI SMITH, SNOHOMISH COUNTY, Snohomish County Treasurer KIRKE SIEVERS, and Snohomish County Assessor LINDA HJELLE, | |
| Defendants. | |

## I.    INTRODUCTION

Currently before the Court is Defendants' Motion for Summary Judgment (Doc. No. 72), Plaintiff's Motion for Partial Summary Judgment Regarding Government Services Provided Outside the Boundaries of Quil Ceda Village (Doc. No. 74), and Plaintiff-Intervenor's Motion for Order Regarding Government Services (Doc. No. 77). Having reviewed the parties' submissions, the record of the case, and the relevant legal authority, the Court will GRANT in part and DENY in part Defendants' Motion for Summary Judgment, and DENY the Motions filed by the Plaintiffs and Plaintiff-Intervenor.

1

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

As alleged in the Complaint (Doc. No. 1), Plaintiff Tulalip Tribes is a federally-recognized Indian tribal government, and the Consolidated Borough of Quil Ceda Village ("the Village") is a political subdivision of the Tulalip Tribes. The Village has been developed as a retail center and entertainment complex, home to stores such as Wal-Mart, Home Depot, and Cabela's (Doc. No. 1 ¶¶ 2, 32, 38). Together, Tulalip and the Village are suing the State of Washington and Snohomish County, along with state and county officials, for declaratory and injunctive relief. Specifically, Plaintiffs challenge three taxes imposed by the State of Washington and Snohomish County on non-Indian businesses and their patrons within the boundaries of Quil Ceda Village: retail sales and use taxes, Wash. Rev. Code §§ 82.08, 82.12, 82.14; business and occupation taxes, Wash. Rev. Code § 82.04; and personal property taxes, Wash. Rev. Code § 84.

Plaintiffs in their complaint set forth three grounds for the illegality of Plaintiff's taxes. First, they allege the taxes violate the Indian Commerce Clause of the United States Constitution. (Doc. No. 1 ¶ 99). Second, they allege the taxes are preempted by federal law. (*Id.* ¶ 109). And third, they allege the taxes interfere with Tulalip's tribal sovereignty. (*Id.* ¶ 114.) The United States intervened as an additional plaintiff, and alleged the same three counts. (Doc. No. 24.)

On June 29, 2016, the parties filed a joint request to modify the scheduling order and to extend discovery and related deadlines by approximately six months. (Doc. No. 58.) During a hearing on the request, the Court invited the parties to submit motions that might help streamline the scope of discovery and ensure an efficient litigation process. (Doc. No. 67.) The motions now under consideration followed. In their motion for summary judgment, Defendants argue that the Indian Commerce Clause does not bar the taxes at issue; Congress has not preempted the taxes at issue, which can be determined without a fact-intensive inquiry; and the taxes do not violate

Tulalip's tribal sovereignty. Plaintiffs, including the United States, move for an order that government services provided outside the Village and not directly supporting commerce in the Village have no legal effect for this action.

## III.   DISCUSSION

### A. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on each of the three counts alleged in the Complaint. The Court GRANTS the Defendants' Motion as to the Indian Commerce Clause claim (Count I), and DENIES the Motion as to the Preemption and Sovereignty claims (Counts II and III).[1]

### 1. Plaintiffs do not state a claim under the Indian Commerce Clause.

The Commerce Clause of the Constitution empowers Congress to regulate commerce in three spheres: "with foreign nations, and among the several States, and with the Indian Tribes." Art. I, § 8, cl. 3. While the text of the Clause represents an affirmative grant of power to Congress to regulate commerce, the Supreme Court has recognized that as to the first two spheres – commerce with foreign nations and among the several states – the Clause also provides "a self-executing limitation on the power of the States to enact laws imposing substantial burdens" on commerce. *South-Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 87 (1984). "This limitation on state power has come to be known as the dormant Commerce Clause." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (2012). "The central rationale" for applying this limitation to interstate commerce "is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511

---

[1] Given the thoroughness of the briefing, the Court finds that oral argument would not be helpful in this matter.

U.S. 383, 390 (1994); *see also Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935) (holding that the Commerce Clause prohibited New York from protecting in-state milk producers from out-of-state competition because the Constitution "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division."). The early states' myopic penchant for walling their borders to outside economic competition explains "[t]he desire of the Forefathers to federalize regulation of foreign and interstate commerce." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 533 (1949).

Plaintiffs argue that this limitation on state interference with interstate and foreign commerce should also be applied to the third sphere named in the Commerce Clause: commerce "with the Indian tribes." Art. I, § 8, cl. 3. They contend that just as the Commerce Clause restricts states from burdening commerce between the states and with other nations, it also restricts states from burdening commerce with Indian tribes. Plaintiffs allege that the state and county taxes at issue do impose such a burden, as they effectively preclude the Tribes from imposing their own taxes on the economic activity in the Village. (Doc. No. 1 ¶ 97.) Because the affected businesses would not be viable if the Tribes imposed their own taxes on top of the taxes already levied by the state and county, Plaintiffs argue that Washington must credit any taxes imposed in the Village by the Tribes against its own state taxes.

The rationale for reading the Commerce Clause to restrict state interference with foreign and interstate trade, however, is not applicable to trade with Indian tribes. While a state has no jurisdiction over the economic affairs of neighboring states or foreign nations, it shares concurrent authority with the Indian tribes over certain on-reservation economic activities. Furthermore, the dormant Interstate Commerce Clause is designed to prevent states from burdening commerce between the states. *See, e.g.*, *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978), *Hunt v.*

4

*Washington State Apple Advertising Comm.*, 432 U.S. 333 (1977), *Dean Milk Co. v. City of Madison, Wisconsin*, 340 U.S. 349 (1951).   Here, Defendants are not seeking any artificial economic advantage; they are simply exercising a taxing authority that – absent federal preemption – they share with the Tribes.

As Plaintiff-Intervenors recognize, "most attempts to employ the Indian Commerce Clause to constrain state taxation of non-Indians in Indian country have been unsuccessful." (Doc. No. 82 at 17.) Indeed, the Supreme Court has whittled any conception of a dormant Indian Commerce Clause down to a wisp.  In *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134 (1980), the Supreme Court permitted the State of Washington to collect an excise tax on the sale of cigarettes by Indian tobacco dealers to non-Indians on a reservation.  The Tribes had imposed their own tax on cigarette sales, but the Indian retailers were nonetheless able to market the cigarettes at a substantial discount because the district court enjoined the State from imposing its own taxes.  *See id.* at 139, 144-45.   The Supreme Court reversed, and held that Washington was not prevented by the Indian Commerce Clause from imposing an excise tax on the Tribes' sale of cigarettes.  It concluded, "It can no longer be seriously argued that the Indian Commerce Clause, of its own force, automatically bars all state taxation of matters significantly touching the political and economic interests of the Tribes."  *Id.* at 157.   The Court did acknowledge that the "Clause may have a more limited role to play in preventing undue discrimination against, or burdens on, Indian commerce," but recognized that Washington's tax was applied in a nondiscriminatory manner, and that there was no evidence that "business at the smokeshops would be significantly reduced by a state tax without credit as compared to a state tax with a credit."  *Id.*

Nine years later, the Court appeared to do away with the small exception it had left in *Colville*. In *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163 (1989), the Court held that New Mexico could validly impose severance taxes on the same on-reservation production of oil and gas by non-Indian producers that was subject to the Tribe's own severance tax. The State's tax was non-discriminatory, the Court recognized, and did not impose an undue burden because the taxes' "burdensome consequence is entirely attributable to the fact that the leases are located in an area where two governmental entities share jurisdiction." *Id.* at 189. The Court distinguished the case from one where "an unusually large state tax has imposed a substantial burden on the Tribe," and acknowledged that it was "reasonable to infer that the New Mexico taxes have at least a marginal effect on the demand for on-reservation leases, the value to the Tribe of those leases, and the ability of the Tribe to increase its tax rate." *Id.* at 186-87.

Further, the Court contrasted the Indian Commerce Clause with the Interstate Commerce Clause in a manner that limited the reach of the former:

> It is also well established that the Interstate Commerce and Indian Commerce Clauses have very different applications. In particular, while the Interstate Commerce Clause is concerned with maintaining free trade among the States even in the absence of implementing federal legislation, the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs. The extensive case law that has developed under the Interstate Commerce Clause, moreover, is premised on a structural understanding of the unique role of the States in our constitutional system that is not readily imported to cases involving the Indian Commerce Clause. Most notably, as our discussion of [Petitioner's] "multiple taxation" argument demonstrates, the fact that States and tribes have concurrent jurisdiction over the same territory makes it inappropriate to apply Commerce Clause doctrine developed in the context of commerce "among" States with mutually exclusive territorial jurisdiction to trade "with" Indian tribes.

*Id.* at 192 (citations omitted).

Because the Supreme Court's interpretation of the Indian Commerce Clause does not recognize a structural limitation on states' ability to interfere with commerce, the dormancy

doctrine integral to Interstate Commerce Clause jurisprudence is inapplicable.  By recognizing a concurrent taxation authority shared by states and tribes, the Court has all but removed the Indian Commerce Clause as a cause of action against nondiscriminatory state taxation.  *See* Robert N. Clinton, *The Dormant Indian Commerce Clause*, 27 Conn. L. Rev. 1055, 1220-21 (1995) (The *Cotton Petroleum* Court "concluded that the dormant Indian Commerce Clause imposed no judicially enforceable limitations on the exercise of state power in Indian affairs.").

Plaintiffs cannot cite any case where a court has found that a nondiscriminatory state tax violates the Indian Commerce Clause.  Defendants' taxes are nondiscriminatory, as they apply uniformly across the State and County.  There is no plausible allegation that these taxes are "unusually large" relative to surrounding jurisdictions.  Plaintiffs are not burdened by any additional record keeping or collection requirements imposed by the State.  And any encumbrance on the Tribes' ability to increase their own tax rate merely reflects the concurrent taxing jurisdiction shared by the State and Tribes.

Congress may choose to preempt Defendants' taxes according to this Clause's affirmative grant of power; the Washington legislature may determine it is prudent policy to credit tribal taxes against its state tax; or the Supreme Court may decide to backtrack from *Cotton Petroleum*, and import Interstate Commerce Clause doctrine into Indian Commerce Clause jurisprudence.  Until any of these events occur, however, the Tribes' contention that they are constitutionally due a tax credit is without merit.

### 2. Preemption analysis requires fact-specific interest balancing.

Defendants argue that because no federal statute precludes the taxes at issue, either expressly or by plain implication, this Court should find as a matter of law that their taxes are not preempted.  Plaintiffs respond that a review of federal statutes is insufficient to resolve the

preemption claim because the Supreme Court requires a fact-specific "particularized inquiry" when states tax transactions on Indian land.[2]

In *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), the Supreme Court laid out guidelines for determining when state taxation of non-Indians on tribal lands would be subject to preemption. The Court explained that the "unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of preemption that have emerged in other areas of the law." *Id.* at 143. "We have thus rejected the proposition," the Court said, "that in order to find a particular state law to have been preempted by operation of federal law, an express congressional statement of that effect is required." *Id.* Thus, contrary to Defendants' assertion that preemption can be determined simply by a review of relevant federal statutes, the Court instructed that, when "a State asserts [taxing] authority over the conduct of non-Indians engaging in activity on the reservation," the preemption analysis requires interest-balancing. *Id.* at 144-45.

> In such cases we have examined the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence. This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.

*Id.*

Since *Bracker*, this particularized inquiry has been applied in virtually every case where a State has sought to tax non-Indians engaging in activity on a reservation. Defendants argue the

---

[2] While Defendants develop at length their argument that no federal statute preempts the taxes at issue, Plaintiffs concede that "Neither Tulalip nor the United States has framed a claim for statutory preemption," and that Tulalip's Complaint "contains no suggestion of express preemption." (Doc. No. 84 at 10-11.) Thus, the kind of statutory analysis provided by Defendants is not necessary to resolve this claim.

preemption test was "narrowed" by the decision in *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163 (1989), where the Court upheld New Mexico's taxes on a non-Indian corporation that produced oil and gas on lands it leased from an Indian tribe.  Even though the Court reached a different result than it did in *Bracker*, however, it made clear that it was applying *Bracker*'s fact-specific inquiry.   When a state seeks to tax lessees of Indian land, the Court said, preemption questions "are not resolved by reference to standards of pre-emption that have developed in other areas of the law, and are not controlled by 'mechanical or absolute conceptions of state or tribal sovereignty.'"  *Id.* at 176 (quoting *Bracker*, 448 U.S. at 145).  "Instead, we have applied a flexible preemption analysis sensitive to the particular facts and legislation involved."  *Id.*  The fact that *Cotton Petroleum* found that the facts of the case balanced differently than those in *Bracker* does not mean that balancing itself is an unnecessary exercise.

Defendants cite two cases where *Bracker* balancing was not applied.  First, in *Arizona Dep't of Revenue v. Blaze Const. Co.*, 526 U.S. 32 (1999), the Supreme Court upheld Arizona's tax on a contractor that was servicing roads on an Indian reservation pursuant to a contract with the federal government.  The Court recognized that *Bracker*'s particularized inquiry has been applied "[i]n cases involving taxation of on-reservation activity . . . where the legal incidence of the tax fell on a nontribal entity engaged in a transaction with tribes or tribal members."  *Id.* at 37.  "But," the Court said, "we have never employed this balancing test in a case such as this one where a State seeks to tax a transaction between the Federal Government and its non-Indian private contractor."  *Id.*  The Court declined to do so because *Bracker* interest balancing would cloud the clear rule established by *United States v. New Mexico*, 455 U.S. 720 (1982), permitting state taxation of federal contractors.  "The need to avoid litigation and to ensure efficient tax administration counsels in favor of a bright-line standard for taxation of federal contracts,

regardless of whether the contracted-for activity takes place on Indian reservations." *Id.* This opinion did not announce a retreat from interest balancing where federal contractors are not involved.

The Supreme Court also declined to apply *Bracker* in *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95 (2005). The reason this time was not that federal contractors were involved, but rather that the taxed transactions took place off of the reservation. An Indian tribe challenged Kansas's imposition of a motor fuel excise tax on a non-Indian distributor of fuel supplied to a gas station operated by the tribe on reservation property. The Court held, "the *Bracker* interest-balancing test applies only where 'a State asserts authority over the conduct of non-Indians engaging in activity on the reservation.' [Citing *Bracker*, 448 U.S. at 144.] It does not apply where, as here, a state tax is imposed on a non-Indian and arises as a result of a transaction that occurs off the reservation." 546 U.S. at 99. Because Defendants' taxes are undisputedly applied to on-reservation activities, *Wagnon* is as inapplicable as *Blaze*.

*Wagnon* does mention that the Supreme Court has "applied the balancing test articulated in *Bracker* only where 'the legal incidence of the tax fell on a nontribal entity engaged in a transaction with tribes or tribal members,' [citing *Blaze*, 526 U.S. at 37] on the reservation." 546 U.S. at 110. The Court further recognized that "[l]imiting the interest balancing test exclusively to *on-reservation* transactions between a nontribal entity and a tribe or tribal member is consistent with our unique Indian tax immunity jurisprudence." *Id.* at 112 (emphasis in original). Defendants argue that this language, which contemplates non-Indians transacting with tribe members, precludes *Bracker*'s application in cases like this one, where non-Indians are transacting with other non-Indians. But *Wagnon*'s holding was focused on *where* the taxed transaction occurred (on the reservation or off of it), not on the tribal or non-tribal identities of the transacting parties. This is

10

apparent from the Court's decision to emphasize "on-reservation" in the sentence delimiting *Bracker*'s reach, *id.* at 112, and its focus in the subsequent sentence and paragraphs on the "significant geographic component" of the *Bracker* inquiry. *Id.* at 112-13. It is further apparent from the Court's succinct statement of its holding: "For the foregoing reasons, we hold that the Kansas motor fuel tax is a nondiscriminatory tax imposed on an off-reservation transaction *between non-Indians*." *Id.* at 115 (emphasis added). Not only does this sentence again highlight the dispositive geographic location of the transaction, it discards completely any requirement that an Indian sit as a party to the transaction.

Erasing any possible ambiguity left by *Blaze* and *Wagnon*, the Ninth Circuit held in *Barona Band of Mission Indians v. Yee*, 528 F.3d 1184 (2008), that *Bracker* applied to a preemption claim where California sought to tax a non-Indian contractor who purchased materials from non-Indian vendors for construction that would take place on a reservation. "Without the convenience of a *per se* bright line test," the Court said, "we turn to the *Bracker* balancing test, developed for those 'difficult questions . . . where, as here, a State asserts authority over the conduct of non-Indians engaging in activity on the reservation.'" 528 F.3d at 1190 (quoting *Bracker*, 448 U.S. at 144). The Court weighed the respective federal and tribal interests against state interests, and determined the state tax at issue was not preempted. *Id.* at 1191-93. Defendants argue *Barona Band* does not resolve whether *Bracker* applies to transactions between non-Indians because *Barona Band* does not mention *Blaze* and "this Court is not bound by 'unstated assumptions on non-litigated issues.'" (Doc. No. 117 at 15 (quoting *Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985)).) But *Barona Band* does cite *Wagnon*, demonstrating that it was aware of this line of cases, and there is an obvious reason why the Court did not cite *Blaze* – *Blaze*'s narrow holding about taxation of federal contractors was wholly inapplicable. The case law does not support

11

Defendants' contention that *Bracker* does not apply in a case like this one, where "a State asserts authority over the conduct of non-Indians engaging in activity on the reservation." *Bracker*, 448 U.S. at 144. A fact-specific analysis will be necessary to resolve the Plaintiffs' preemption claim. [3]

### 3. Tribal sovereignty remains an independent barrier against state taxation.

Finally, Defendants argue that the Supreme Court has never recognized tribal sovereignty as an independent basis to invalidate a state tax, and thus Plaintiffs' sovereignty claim should be dismissed. Defendants contend that sovereignty interests merely serve as a backdrop in the preemption analysis. Plaintiffs correctly respond that the doctrine of tribal self-government does provide an independent bar to state taxation.

In *Bracker*, the Court explained that federal preemption and tribal sovereignty represent "two independent but related barriers to the assertion of state regulatory authority over tribal reservations and Indians." 448 U.S. at 142. "The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members." *Id*. at 143. This unequivocal statement remains good law.

Under the Ninth Circuit's standard, "Whether a state tax infringes on tribal sovereignty depends on the extent to which tribal self-government is affected." *Gila River Indian Community v. Waddell*, 91 F.3d 1232, 1239 (9th Cir. 1996) (*Gila II*). This determination requires a particularized inquiry that essentially resembles *Bracker* balancing. In *Chemehuevi Indian Tribe v. California State Bd. of Equalization*, 800 F.2d 1446 (9th Cir. 1986), for example, the Court examined the tribe's self-government claim against California's imposed cigarette tax by

---

[3] As all parties agree that a more fully developed factual record is necessary to demonstrate the respective federal, tribal, and state interests at issue, the Court will not conduct the particularized analysis at this time.

"balanc[ing] the state's interest in applying its cigarette tax to on-reservation sales to non-Indians against the impact from the tax's imposition on the Tribe's ability to govern itself effectively." 800 F.2d at 1449.  Indeed, the Supreme Court in *Colville* explained that "The principle of tribal self-government . . . seeks an accommodation between the interests of the Tribe and Federal Government, on the one hand, and those of the State, on the other." 447 U.S. at 156.

Because the preemption test and sovereignty test are so closely related, it is unsurprising that the party that prevails on preemption interest balancing virtually always also prevails on sovereignty interest balancing.  But as the Court has not been asked to weigh the preemption interests on the current record, it will refrain from doing so on the sovereignty claim as well.  The Tribe remains "entitled to prove its allegations." *Gila River Indian Community v. Waddell*, 967 F.2d 1404, 1413 (9th Cir. 1992) (*Gila I*) (remanding so that the tribe could offer evidence in support of its self-government claim).

## B. Plaintiff's Motion for Partial Summary Judgment

Plaintiffs move for an order holding that, as a matter of law, government services that are provided by Defendants outside the boundaries of Quil Ceda Village and that do not directly support commerce in the Village cannot be factored into *Bracker* balancing.  Defendants respond that these services are relevant to both preemption and sovereignty interest balancing.  Because the Supreme Court has acknowledged that off-reservation services may weigh in the States' favor when the taxed goods are imported from off of the reservation and are sold to non-Indian taxpayers who reside off the reservation, Defendants are entitled to present evidence of such services.

In *Colville*, the Supreme Court balanced competing tribal and state interests in determining that a state tax on cigarettes was not preempted, and recognized that off-reservation state-provided services weighed in favor of state interests:

> While the Tribes do have an interest in raising revenues for essential governmental programs, that interest is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services. The state also has a legitimate governmental interest in raising revenues, and that interest is likewise strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services.

447 U.S. at 156-57.  The Court found relevant that the individuals who bore the cigarette taxes were largely non-Indians residing off the reservation who did not receive significant tribal services. *Id.* at 157.

Consistent with *Colville*, in *Salt River Pima-Maricopa Indian Community*, 50 F.3d 734 (9th Cir. 1995), the Ninth Circuit identified three factors relevant to the preemption inquiry: "the degree of federal regulation involved, the respective governmental interests of the tribes and states (both regulatory and revenue raising), *and the provision of tribal or state services to the party the state seeks to tax.*" 50 F.3d at 736 (emphasis added).  The *Salt River* Court upheld Arizona sales and rentals taxes imposed on non-Indian businesses selling to non-Indian customers in a shopping mall located on a reservation.  The Court recognized that non-Indians bore the legal incidence of Arizona's taxes, and further noted that "Arizona and its agents provide the majority of the governmental services used by these taxpayers [off the reservation]." *Id.* at 737.  "Consequently," the Court held, "the State's interest is at its strongest, not its weakest." *Id.*

Defendants point out that the the same scenario is present here.  Because the Defendants seek to tax transactions between non-Indians, the state services provided to these non-Indians is a relevant component of the preemption inquiry.   To the extent Defendants can show that they "provide the majority of the governmental services used by these taxpayers," their interests may weigh more heavily.  There is no requirement that these services be provided in the Village, or even on the reservation.  In *Salt River*, the Court noted it was "undisputed that Arizona and its

14

subordinate entities provide the governmental services used by the non-Indian purchasers *off the reservation*." *Id.* at 735 (emphasis added).

In support of their argument that services provided outside the Village cannot defeat preemption, Plaintiffs cite cases where the weight of other factors proved dispositive.  In *Bracker*, for example, Arizona sought to impose a motor carrier license tax and an excise fuel tax on a logging company for driving on public Bureau of Indian Affairs and tribal roads within the Fort Apache Reservation.  448 U.S. at 139-40.  The Supreme Court held that the taxes were preempted because the federal government comprehensively regulated the harvesting of Indian timber, and "[t]here is no room for these taxes in the comprehensive federal regulatory scheme." *Id.* at 148.  Because the federal and tribal interests in this sphere were overwhelming, the Court set an exacting evidentiary standard that the State would need to satisfy in order to prevail – proof of a specific "regulatory function or service performed by the State that would justify the assessment of taxes." *Id.* at 148-49.  Because Arizona could not identify any such function or service related to Bureau or tribal roads within the reservation, its taxes were found to be preempted.  *Id.*

However, the *Bracker* Court pointedly distinguished the case from one "in which the State seeks to assess taxes in return for government functions it performs for those on whom the taxes fall." *Id.* at 150.  Here, Defendants do seek to impose taxes on non-Indians for services provided to them.  And unlike the timber production in *Bracker*, shopping malls on Indian lands are not comprehensively regulated by the federal government.  It follows, then, that the State may be able to establish its interests without proving the delivery of services to tribe members on the reservation.

In *Yavapai-Prescott Indian Tribe v. Scott*, 117 F.3d 1107 (9th Cir. 1997), the Ninth Circuit explained that courts have only required a State's taxes to directly fund services associated with

the taxed activities when strong federal and tribal interests are present. 117 F.3d at 1111 (citing *Salt River*, 50 F.3d at 737; *Gila River II*, 91 F.3d at 1239). Such weighty federal and tribal interests were found to exist in cases cited by Plaintiffs, such as the presence of comprehensive and pervasive federal regulation, *see, e.g., New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983); *Ramah Navajo Sch. Bd., Inc. v. Burea of Revenue of New Mexico*, 458 U.S. 832 (1982); *Bracker*, 448 U.S. 136, *Hoopa Valley Tribe v. Nevins*, 881 F.2d 657 (9th Cir. 1989), or the taxation of "*Indian* resources or services," *Salt River*, 50 F.3d at 738 (emphasis in original) (citing *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987) (bingo), *Bracker* (timber), *Crow Tribe of Indians v. State of Montana*, 819 F.2d 895 (9th Cir. 1987) (coal), *Hoopa Valley* (timber)). Those interests are not present here.

The nature of the state's relationship with the taxed activity is weaker when the transaction is comprehensively regulated by the federal government or when the value of the taxed resources is derived almost exclusively on the reservation. In such cases, the State may be required to demonstrate that its services maintain a close nexus with the taxed transaction itself. Here, in contrast, where the tribe is not a direct party to the transaction and the taxed goods have been imported from off the reservation for sale to non-Indians also living off the reservation, the State's interests may be demonstrated, in part, by evidence of services provided off the reservation to the non-Indian taxpayers. Defendants are entitled to present such evidence.

16

## IV.    CONCLUSION

For the foregoing reasons, the Court HEREBY:

1.  GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment (Doc. No. 72). The Motion is GRANTED as to Count I and DENIED as to Counts II and III.

2.  DENIES Plaintiffs' and Plaintiff-Intervenor's Motion for Partial Summary Judgment Regarding Government Services (Doc. Nos. 74, 77.)

Dated this 6th day of January, 2017.

*Barbara J Rothstein*

Barbara Jacobs Rothstein
U.S. District Court Judge