UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THE TULALIP TRIBES and THE CONSOLIDATED BOROUGH OF QUIL CEDA VILLAGE, Plaintiffs,<br>and<br>THE UNITED STATES OF AMERICA, Plaintiff-Intervenor,<br><br>v.<br><br>THE STATE OF WASHINGTON, *Washington State Governor JAY INSLEE, Washington State Department of Revenue Director VIKKI SMITH, SNOHOMISH COUNTY, Snohomish County Treasurer KIRKE SIEVERS, and Snohomish County Assessor LINDA HJELLE,*<br>Defendants | NO.  15-CV-940 BJR<br><br>MEMORANDUM OPINION |

## I.    INTRODUCTION

Plaintiffs the Tulalip Tribes ("Tulalip" or "the Tribes") and the Consolidated Borough of Quil Ceda Village ("Quil Ceda Village," "QCV," or "the Village"), a municipality located on Tulalip tribal land, together with Plaintiff-Intervenor the United States, bring this case challenging the administration and enforcement of certain taxes within Quil Ceda Village by Defendants. Plaintiffs seek a declaration and an injunction prohibiting the individual named

Defendants,[1] the State of Washington, and Snohomish County from collecting retail sales and use tax, business and occupation ("B&O") tax, and personal property tax from businesses located at QCV, arguing that collection of these taxes imposes on Tulalip's tribal sovereignty, and is preempted by operation of federal law.

Having heard eight days of live trial testimony in this matter, and having reviewed dozens of witness declarations and expert reports and hundreds of exhibits, the Court now finds and rules as follows.

## II.    BACKGROUND

A.    Overview of Plaintiffs' Claims

The Tulalip Tribes is a federally recognized Indian[2] tribal government, whose enrollment as of 2017 numbered an estimated 4,686 members. Ex. T-1215, Stipulated Facts ("SF") 59, 84.[3] The 22,000-acre Tulalip Reservation is located within the State of Washington and Snohomish County, approximately 35 miles north of Seattle. *Id.*, SF 86. Quil Ceda Village, 2,100 acres of land held in trust by the U.S. government for the benefit of the Tribes, is located within the Tulalip Reservation, bordered by the Interstate-5 highway on the east, and roughly on the north and south by 112th and 88th Streets, respectively. Ex. T-1215, SF 87; Ex. T-12. Over the last 20+ years, Tulalip has turned this once-undeveloped 2,100-acre section of tribal land into the thriving Quil Ceda Village commercial center, which attracts tens of thousands of visitors and customers a day.

Today, Quil Ceda Village is home to dozens of commercial and retail businesses. Several of these businesses are owned by the Tulalip Tribes, including the Tulalip Casino and the Tulalip Resort Hotel. Many of the businesses at Quil Ceda Village, however, merely lease land from Tulalip, and are neither Indian-owned nor operated, and employ few members of the

---

[1] The individual named Defendants are Washington State Governor Jay Inslee, Washington State Department of Revenue Director Vikki Smith, Snohomish County Treasurer Kirke Sievers, and Snohomish County Assessor Linda Hjelle.

[2] The Court has adopted the use of the term "Indian," commonly used by federal courts and by all parties in this case.

[3] During trial, the parties introduced exhibits listing and articulating relevant facts to which all parties have stipulated. Reference herein to such stipulated facts shall be by exhibit number and stipulated fact ("SF") number.

Tulalip Tribes. Transcript of Trial ("Tr."), at p. 397. These include stores such as Wal-Mart, Home Depot, Cabela's, and the 100+ retail stores located in the Seattle Premium Outlets Mall, including Calvin Klein, a Levi's Outlet Store, a NIKE Factory Store, and The North Face. *See* Expert Witness Report of Mukesh Bajaj, Ex. S-605 at 5. By and large, customers of these businesses are not tribal members, but travel to QCV from outside the reservation. None of the goods sold by these businesses are produced by Tulalip or on the Tulalip reservation. Ex. S-596, SF 587.

The State of Washington and Snohomish County collect tens of millions of dollars in taxes annually from the non-Indian owned businesses at Quil Ceda Village.[4] Ex. T-1215, SFs 9, 29. Tulalip claims that Defendants' collection of taxes, including the combined 8.9% sales tax, precludes Tulalip from collecting its own taxes from these businesses. Compl. ¶ 1. In their Complaint, Plaintiffs stated two claims that have survived a motion for summary judgment: (1) that federal law preempts Defendants' administration and enforcement of State and County taxes; and (2) that the taxation at issue interferes with Tulalip's sovereign right to make and be governed by its own laws. Compl. ¶¶ 94-114.[5]

Over the past several decades, federal law concerning preemption and tribal sovereignty has evolved, beginning in the modern era with the seminal Supreme Court case of *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145 (1980). *Bracker* involved a state's attempt to impose certain license and fuel-use taxes on a non-Indian logging company harvesting timber on tribal land. For cases involving matters of Indian sovereignty, the Supreme Court held, "questions of pre-emption . . . are not resolved by reference to standards of pre-emption that have developed in other areas of the law, and are not controlled by 'mechanical or absolute conceptions of state or tribal sovereignty.'" *Cotton Petroleum Corp. v.*

---

[4] By operation of federal law, Defendants do not collect the taxes at issue in this case from the Tulalip Casino, the Tulalip Resort Hotel, or any other QCV businesses that are owned by Tulalip or Tulalip tribal members. Ex. C-194, SF 3.

[5] Defendants' Motion for Summary Judgment sought dismissal of all three counts asserted in the Complaint. On January 5, 2017, the Court granted Defendants' motion as to Plaintiffs' claim that Defendants' collection of the taxes at issue in this case imposed undue burdens on Tulalip in violation of the Indian Commerce Clause of the U.S. Constitution (Count I). The Court denied the motion as to the remaining two claims. *See Tulalip Tribes v. State of Washington*, No. 2:15-CV-00940-BJR, 2017 WL 58836, at *4 (W.D. Wash. Jan. 5, 2017), Dkt. No. 132.

*New Mexico*, 490 U.S. 163, 176 (1989) *citing Bracker*, 448 U.S. at 145. Instead, recognizing "the broad power of Congress to regulate tribal affairs" and "the semi-autonomous status of Indian tribes," the Court held that even in the absence of an express Congressional statement of preemption, federal law may still preempt a state's attempt to exercise authority over activity on Indian land. *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 837 (1982), citing *Bracker*, 448 U.S. at 142.

Nevertheless, the *Bracker* Court continued, unlike in cases where on-reservation conduct involving only Indians is at issue, "[m]ore difficult questions arise where, as here, a State asserts authority over the conduct of non-Indians engaging in activity on the reservation." 448 U.S. at 144, 145. Thus, in *Bracker* and subsequent cases involving "more difficult questions" such as those before this Court, courts have repeatedly employed a flexible, fact-intensive inquiry into certain factors bearing on the question of whether federal law limits taxes that may be imposed by the State. *See, e.g., Barona Band of Mission Indians v. Yee,* 528 F.3d 1184, 1189 (9th Cir. 2008), *citing Bracker* at 142. These factors include "the degree of federal regulation involved, the respective governmental interests of the tribes and states (both regulatory and revenue raising), and the provision of tribal or state services to the party the state seeks to tax." *Salt River Pima-Maricopa Indian Community v. Arizona*, 50 F.3d 734, 736 (9th Cir.1995) (citation omitted). The Court's focus in this case, therefore, is on: (1) the comprehensiveness of federal regulation over the activity that is subject to taxation; (2) the weight of the respective interests the parties have in whether the taxes at issue are allowed; and (3) the value of the services the parties provide to the Quil Ceda Village customers and businesses, on whom the burden of the taxes at issue falls.

As this Court has already noted in this case, Plaintiffs' claims require "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Tulalip Tribes v. State of Washington*, No. 2:15-CV-00940-BJR, 2017 WL 58836, at *4 (W.D. Wash. Jan. 5, 2017), *quoting Bracker*, 448 U.S. at 145. Plaintiffs argue that under such inquiry, the federal and tribal interests in this case "overwhelm" the Defendants' interests. It must be emphasized, however, that the *Bracker* balancing test does not take place in a vacuum; the right to tax does not merely fall to the party whose interests are greatest, or that has

4

provided the most value in government services to the taxpayers at issue. Instead, although *Bracker* and its progeny prescribe a fact-intensive balancing test as part of the preemption analysis, the balancing takes place within the context of the underlying question, which is whether federal law preempts "the plenary power of the States over residents within their borders." *Ramah*, 458 U.S. at 836–37, *citing McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 165 (1973). Ultimately, "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests *reflected in federal law*, unless the State interests at stake are sufficient to justify the assertion of State authority." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 338–39 (1983) (emphasis added). With this standard in mind, the Court turns to the facts of this case as presented at trial.

    B.  <u>Development of Quil Ceda Village</u>

    *1.  History of Quil Ceda Property*

      During World War II, the 2,100-acre parcel that is now Quil Ceda Village was used by the U.S. Army for basic military training and for storage of munitions. Ex. T-6. Using federal funds, Tulalip purchased the land in 1949, and in 1959 entered into a long-term lease with the Boeing Corporation. *Id*. Boeing used the land for a test site until the late 1990s, when it exercised a right to terminate the lease. Tr. at p. 96; Ex. T-100.

      After Boeing terminated the lease, Tulalip began clearing the land and building the infrastructure necessary to support the destination resort that would include the Tribes' casino and hotel and the commercial retail center that would become Quil Ceda Village. Tr. at p. 325. The land was potentially contaminated from years of misuse, and was essentially raw, undeveloped land, with "no roads or utilities, including water, sewer, phone, cable, fiber, natural gas, or electricity." *See* Ex. T-1218, SF 663; Ex. T-385; Ex. T-1218, SF 666; *see also* Tr. at p. 143. Because there was limited access to the Village from the adjacent I-5 highway, Tulalip undertook, with financial support from the federal government, the task of engineering and constructing an I-5 interchange at 88th Street, the southernmost border of QCV. Ex. T-1218, SFs 1404, 1406, 747. Using tribal and some federal funds, Tulalip also built a road network within the Village, and infrastructure for water, sewer, electrical, gas, and telecommunications. *Id*. Tulalip retained control of the overall commercial development of QCV, fulfilling the real estate development functions itself. Ex. T-1215, SF 481. Tulalip

contributed most of the funding towards the infrastructure projects, estimated at an investment of over $150 million. Ex. T-51. The federal government made substantial financial contributions to the development, estimated at over $50 million. *See* Exs. U-153, U-483, U-484. Overall, Tulalip has contributed 76% of the funds necessary for building the infrastructure serving Quil Ceda Village, and the federal government has contributed 19%, with the remaining funds contributed by Washington and Snohomish County. *See* Ex. T-1237; T-1234.

### 2. *Retail Tenants at Quil Ceda Village*

As infrastructure construction at the Village continued throughout the late 1990s and early 2000s, Tulalip was simultaneously marketing development opportunities to outside parties and negotiating with prospective business tenants. Quil Ceda Village secured its first anchor tenants, Walmart and Home Depot, in 1999 and 2000 respectively. Ex. T-1215, SF 484; Ex. T-1218, SFs 552, 554. Tulalip and the retail developer Chelsea Property Group entered into a lease in 2004 for what would become the 550,000-square-foot Seattle Premium Outlets ("SPO") mall. Ex. T-1230, SF 565. In 2011, Tulalip entered into a build-to-suit lease with Cabela's retail store. Ex. T-1215, SF 497. By 2016, dozens of non-tribal businesses had opened and were operating within Quil Ceda Village, including, in addition to those already noted, a Bank of America (2004); a McDonalds (2007); an Olive Garden (2010); a Ram Restaurant and Brewhouse (2012); and a Panera Bread restaurant (2014). Ex. T-1215, SF 484. Tulalip also opened a number of its own businesses at QCV during this period, most notably the Tulalip Casino (2003), the Tulalip Resort Hotel (2008); The Tulalip Retail Center mall (2001); an amphitheater (2005); and a pharmacy (2008). *Id*., SF 490. In 2015, the most recent year provided to the Court, the Tribes received an estimated total of $5.2 million in land lease payments from non-tribal businesses at Quil Ceda Village. *See* Expert Report of Todd D. Menenberg, Ex. S-579 at 14.

The 150+ businesses at Quil Ceda Village today gross hundreds of millions of dollars a year. Compl. ¶55. None of the businesses from whom the State and County collect taxes at issue in this case are Indian owned or operated, and none of the goods sold at these stores are manufactured on the reservation. Ex. S-596, SF 587. Very few of the employees of the non-Indian owned businesses are Tulalip members. Ex. T-1223, SF 512.

*3. The Consolidated Borough of Quil Ceda Village Political Subdivision*

In 2000, while infrastructure construction and development of QCV continued, the Tulalip Board of Directors passed the Tulalip Tribes Political Subdivisions Act, enabling Tulalip to create political subdivisions on Tulalip reservation land. The Tulalip Tribes Res. No. 2000-347, Ex. T-22. Pursuant to authority created by the Political Subdivisions Act, the Board of Directors chartered the municipal subdivision of the Consolidated Borough of Quil Ceda Village in 2001. Quil Ceda Village Subordinate Boards, The Tulalip Tribes Res. No. 2001-068, Ex. T-16a. Tulalip intended Quil Ceda Village to be the vehicle for providing QCV businesses, employees, and customers with a localized municipal government "attendant to the needs of a rapidly developing business center" on the reservation, "and to provide necessary government services." Ex. T-1215, SF 68.

C. State and County Taxes at Issue

Washington does not have a state income tax, and its sales tax, imposed at a rate of 6.5%, is the largest single source of the State's revenues. Ex. T-1215, SF 27; Ex. C-194, SF 1. For the 2015-2017 biennium, the State collected an estimated $18.9 billion in sales tax. *Id*. In 2001, the State collected $8.2 million from businesses in Quil Ceda Village; by 2004, that amount had nearly doubled, to $15.7 million. Ex. T-1215, SF 29. The amount continued to increase annually, with some variation around 2008, until by 2015, the most recent year produced to the Court, the State collected a total $31,718,857 from the QCV businesses in sales tax. *Id*.

Sales tax revenues are deposited into the State's General Fund, nearly 60% of which goes towards supporting education in Washington, from K-12 schools through higher education. Ex. T-1240, SFs 931, 932. Approximately 17% of the General Fund goes towards supporting State health and social services, such as cash assistance, food grants, and nursing homes. Ex. S-611, Decl. of Judy Fitzgerald, ¶¶ 7, 9; Ex. S-11. Pursuant to state law, the legal incidence of the sales tax falls upon the buyer, although it is the seller who is charged with collecting and remitting the tax to the State. Ex. C-194, SF 34, 35; RCW 82.08.050(1).

Snohomish County also administers a retail sales tax, at a rate of 1.2%, with an additional 1.2% collected by the County on behalf of the Snohomish County Transit Authority. Ex. T-1215, SF 1. Combined, the sales tax collected at Quil Ceda Village and remitted to

Snohomish County in 2001 was $2.15 million; between 2002 and 2013 it ranged from $4 million to $9.5 million per year, and by 2015, the amount of sales tax collected by Snohomish County exceeded $10.2 million. Ex. T-1215, SF 29. The County's General Fund relies primarily on sales tax and property tax, and an estimated 74% of the County's General Fund is devoted to providing law and justice services. Ex. C-4, p. 7.

Washington also imposes a B&O tax on businesses engaged in retail sales "for the act or privilege of engaging in business activities" in the State. RCW 84.04.220. The current rate of the B&O tax is .471% of gross sales. *Id.*, Ex. T-1215, SF 30. Between 2001 and 2015, the State collected between $600,000 and $2.3 million from businesses within Quil Ceda Village, in the most recent three years averaging well over $2 million. Ex. T-1215, SF 31. B&O tax revenues also go towards the State's General Fund. Snohomish County does not have a B&O tax. Ex. C-194, SF 12.

State and County personal property taxes are imposed on businesses based on a complex network of Tax Area Codes, and are collected by the Snohomish County Treasurer and deposited into the State and County General Funds. Ex. C-194 17. Between 2008 and 2015, personal property taxes collected within Quil Ceda Village by the County on behalf of the State of Washington ranged between $13,833 and $61,921. As a function of the various taxing districts, and various applicable levies, the parties estimated the approximate total amount of personal property taxes collected annually within Quil Ceda Village by the County to be in low six-figures. Ex. T-1215, SFs 18-21.

The Tulalip Tribes imposes a sales tax on businesses on the Tulalip reservation, including within Quil Ceda Village, at a rate of 8.6%, but does not enforce these taxes against non-Indian-owned businesses.[6] Ex. T-1215, SF 33.

### III.    DISCUSSION

A. Plaintiffs' Preemption Claim

"The ability of a state to apply generally-applicable taxes to non-Indians performing otherwise-taxable functions on an Indian reservation is well established." *Mashantucket*

---

[6] Tulalip is not challenging collection of taxes by the State or County within the reservation on businesses located outside Quil Ceda Village. Ex. T-1215, SF 22.

*Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 468–69 (2d Cir. 2013). Nevertheless, as discussed above, "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the State interests at stake are sufficient to justify the assertion of State authority." *Mescalero*, 462 U.S. at 334. Plaintiffs' preemption claim requires a fact-specific balancing of the parties' interests to determine whether federal law preempts the authority of Washington and Snohomish County to impose a generally applicable tax on commerce within their borders. *Bracker*, 448 U.S. at 136; *Gila River Indian Cmty. v. Waddell*, 91 F.3d 1232, 1236 (9th Cir. 1996) ("*Gila River II*"). This balancing involves an inquiry into the following: (1) the comprehensiveness of federal regulation over the activity that is subject to taxation; (2) the weight of the respective interests the parties have in whether the taxes at issue are allowed; and (3) the value of the respective services the parties provide to the Quil Ceda Village customers and businesses, on whom the burden of the taxes at issue falls. If a careful examination of the facts reveals that the State and County authority "interferes or is incompatible with" federal and tribal interests, the State and County authority will be preempted, "unless the state interests at stake are sufficient to justify the assertion of state authority." *Bracker*, 448 U.S. at 143.

       1. *Federal Regulation of the Taxed Activities and Other Federal Interests*

    (a) Federal Regulation of Taxed Activities

Plaintiffs and Plaintiff-Intervenor the United States in particular claim that the "breadth of federal laws and policies underlying Tulalip's development and operation of the Village is unique." Plaintiffs' Post-Trial Brief at 4. The preemption question in *Bracker* and many of cases following it has turned in large part on the extent of federal regulation involved in the activity subject to taxation. In *Bracker*, for example, the Supreme Court found that the timber industry on tribal lands was "heavily regulated" by the federal government, "subject to extensive federal control" taking the form of "Acts of Congress, detailed regulations promulgated by the Secretary of the Interior, and day-to-day supervision" by the BIA. 448 U.S. at 145. Those regulations set guidelines for the sale of timber, restricted clear-cutting, regulated the advertising of timber sales, set a process of bidding and entering into contracts, prescribed fire protection measures, and tasked the BIA with "literally daily supervision of the harvesting and management of tribal timber." *Id.* at 147; *see also Cotton Petroleum Corp. v. New Mexico*,

490 U.S. 163, 184 (1989) (describing *Bracker* as "involving federal policy 'in a context in which the Federal Government has undertaken to regulate the most minute details of the Tribe's timber operations"). The *Bracker* Court found that given the extent of federal regulation governing the taxed activity, "[t]here is no room for these [State] taxes in the comprehensive federal regulatory scheme," and held, "[i]n these circumstances we agree with petitioners that the federal regulatory scheme is so pervasive as to preclude the additional burdens sought to be imposed in this case." *Bracker*, 448 U.S. at 148.

Similarly, in *Ramah Navajo School Board v. Bureau of Revenue of New Mexico*, which involved a state tax related to construction of schools on tribal land by a non-Indian construction company, the Supreme Court highlighted that the federal government had an obligation to "conduct preliminary on-site inspections, and prepare cost estimates for the project in cooperation with the tribal organization," and the power to "require that all subcontracting agreements contain certain terms, ranging from clauses relating to bonding and pay scales, [] to preferential treatment for Indian workers." 458 U.S. 832, 840–41 (1982). Federal regulations also required "the tribal organization to maintain records for the Secretary's inspection." *Id*. As the Supreme Court found, "[t]his detailed regulatory scheme governing the construction of autonomous Indian educational facilities is at least as comprehensive as the federal scheme found to be pre-emptive in *White Mountain*," and "le[ft] no room for the additional burden sought to be imposed by the State through its taxation." *Id*. at 841-42 (citations omitted). A year later, in *New Mexico v. Mescalero Apache Tribe*, the Supreme Court invalidated the state's fishing and hunting regulations on tribal land, where "federal law requires the Secretary [of the Interior] to review each of the Tribe's hunting and fishing ordinances," which were "based on the recommendations made by a federal range conservationist employed by the Bureau of Indian Affairs. Moreover, the [federal] Bureau of Sport Fisheries and Wildlife stocks the reservation's waters based on its own determinations concerning the availability of fish, biological requirements, and the fishing pressure created by on-reservation fishing." 462 U.S. at 338–39. The Supreme Court therefore found "the exercise of concurrent State jurisdiction in this case would completely disturb and disarrange the comprehensive scheme of federal and tribal management established pursuant to federal law." *Id*. at 338 (internal citation and quotation omitted).

These cases contrast starkly with the situation here. As this Court has already found, neither shopping malls specifically, nor retail commercial developments more generally, are subject to the "comprehensive" federal regulation of the sort that drove the Supreme Court to find state authority was preempted in *Bracker*, *Ramah* and *Mescalero*. *See Tulalip Tribes v. State of Washington*, No. 2:15-CV-00940-BJR, 2017 WL 58836, at *8 (W.D. Wash. Jan. 5, 2017). The United States does not make or even review managerial decisions at the businesses located within Quil Ceda Village, let alone day to day operations. The federal government does not set prices, or regulate advertising, or decide what goods should be sold at QCV, or impose infrastructure requirements, or oversee employment decisions, or regulate the import of goods from off the reservation, or require approval of contracts. It has not dictated or, from evidence presented at trial, even played a substantial role in, the direction Tulalip has chosen to take the development of Quil Ceda Village. Federal involvement in the Quil Ceda Village development and operations—existing most notably in the form of funding—has not in any apparent way been hindered or even affected by the taxes at issue in this case. The evidence presented at trial failed to demonstrate that the imposition of these taxes might "disturb and disarrange" federal regulation, or "throw additional factors into the federal calculus" of the United States' relationship with Tulalip, as the Supreme Court found the state taxes in *Bracker* and *Ramah,* or the state hunting regulations in *Mescalero*, would have. *See* 448 U.S. at 149; *Mescalero*, 462 U.S. at 338–39.

The United States has cited several federal statutes that it claims represent its "interest" in and "sustained commitment" to the commercial activity on the Tulalip reservation, including the Tribal Governmental Tax Status Act (granting tribal governments status similar to states for certain tax purposes, including recognition of Quil Ceda Village as political subdivision of Tulalip), the Indian Reorganization Act (authorizing, *inter alia*, federal government to purchase lands to hold in trust for Indian tribes, and providing federal funds for purchase of QCV property), the Indian Self Determination and Education Assistance Act (authorizing tribes to contract with agencies to administer certain federal programs), and the Native American Business Development, Trade Promotion, and Tourism Act (creating the Office of Native American Business Development and certain related programs). Pub. L. 97-473, 96 Stat. 2607; Pub. L. No. 73-383, 48 Stat. 984; Pub. L. No. 93-638, 88 Stat. 2203; Pub. L. 106–

464, 114 Stat. 2012. These statutes broadly cite as their purpose the federal government's support for tribal economic development, and are part of the network of federal legislation that makes up the United States' relationship with tribal governments throughout the U.S. But "even when given the broadest reading to which they are fairly susceptible," these statutes do not provide any discernable regulatory framework for the activity that is the subject of taxation in this case: the retail and commercial activity at Quil Ceda Village. *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 155 (1980). If this Court were to find that these statutes provided the extent of federal regulation necessary to satisfy the standard applied in *Bracker*, state authority over nearly all economic activity within the Tulalip reservation—and indeed, virtually all tribal reservations—would potentially be preempted. This is not the outcome prescribed by *Bracker. See Colville*, 447 U.S. at 155.

The Plaintiffs also highlighted federal Indian-land leasing laws and regulations, and in particular the Tulalip Leasing Act, as evidence of the federal government's promotion of Tulalip's economic development. In 1970, in recognition of the Tribes' "able and progressive leadership," and the realities and demands of commercial development, the federal government enacted the Tulalip Leasing Act, which eased for Tulalip the usual requirement that leases on Indian land be subject to approval by the Bureau of Indian Affairs ("BIA"). Pub. L. No. 91-274, 84 Stat. 301; Ex. T-10. Along with an amendment in 1986, the Tulalip Leasing Act authorized the Tulalip Tribes to enter into lease agreements for up to 75 years without BIA approval. *See* U-490 at 4-5.

Although courts have in some cases found federal regulation related to leasing on tribal lands to be "extensive and exclusive," *see, e.g., Seminole Tribe of Fla. v. Stranburg*, 799 F.3d 1324, 1339 (11th Cir. 2015), in this case, Plaintiffs' reliance on federal leasing regulation generally and the Tulalip Leasing Act in particular is misplaced for at least two reasons. First, the Tulalip Leasing Act did not impose *additional* federal regulation on the Tribes in the sphere of leasing of tribal lands; to the contrary, it relieved Tulalip of certain restrictions generally applicable to other tribes. Consequently, it does not appear that the United States had a role in any of the modern leases executed within Quil Ceda Village. The Tulalip Leasing Act thus gave rise to circumstances in which state and local taxation of activity on tribal land is *less* an interference in the federal government's authority, not more.

Second, even if the Tulalip Leasing Act, in conjunction with other federal leasing regulations of tribal land, were considered a "comprehensive" regulatory framework, it would at most be one governing the *leasing* activities of the Tribes. But this case is not about a tax on lease revenues, a possessory interest tax, or any other tax touching on the scope of the Tribes' authority to lease or otherwise use its lands. Indeed, the taxes at issue in this case are not even on the development or operation of Quil Ceda Village itself but, most broadly defined, on the sale of goods that takes place at the Village. The cases are clear that the existence of extensive federal regulation in leasing on tribal land does not operate to preclude state taxation of non-leasing activities. *See Gila River II,* 91 F.3d at 1237 ("mere existence of federal oversight over leasing of Indian lands" does not preempt state sales tax where "tax would not interfere with the use and development of the Tribe's property."); *Stranburg*, 799 F.3d 1324 (finding extensive federal regulation on leasing preempted state tax on rent paid to tribe by non-Indian lessees, but not state utility tax).

In sum, federal regulation over the activities that are subject to the taxes at issue in this case is far from the sort of "extensive" or "pervasive" regulation courts have found in those *Bracker* cases in which state and/or local taxation was preempted by federal law. The federal involvement that does exist related to Quil Ceda Village—largely related to leasing and one-time contributions to infrastructure projects—can hardly be said to "leave no room" for state and local taxation of the retail and commercial activity by non-Indians in the Village. The Court finds the minimal extent of such regulation does not weigh in favor of preemption in this case.

(b) Other Federal Interests

As discussed above, the Ninth Circuit has recently reiterated that in cases involving a *Bracker* preemption claim, "[f]ederal interests are greatest when the government's regulation of a given sphere is 'comprehensive and pervasive.'" *Barona*, 528 F.3d at 1192, *quoting Ramah*, 458 U.S. at 839. The Court has found this is not the case here. Nevertheless, even where federal regulation of the taxed activity is not extensive, federal law may still preempt state and local authority if the federal and tribal interests outweigh those of the state and county. *See Yavapai-Prescott Indian Tribe v. Scott*, 117 F.3d 1107, 1111 (9th Cir. 1997) ("In

13

*Salt River* and *Gila River II* the Secretary's regulation of the leases was accorded little weight" but those courts still employed balancing test by reviewing parties' respective interests.).

As Plaintiffs argued at trial, the federal government has a substantial interest in promoting and supporting Tulalip's economic development and self-sufficiency. Here, these interests have found their clearest expression in the substantial financial investment the United States has made in construction of the infrastructure supporting Quil Ceda Village, over the years totaling $50 million, or 19% of the total cost of construction of QCV infrastructure. Ex. T-51. In the absence of a pervasive regulatory scheme governing this interest in tribal economic development, however, courts have routinely found that even where "the federal government has expressed an interest in assisting tribes in their efforts to achieve economic self-sufficiency . . . that interest does not, without more, defeat a state tax on non-Indians." *Salt River Pima-Maricopa Indian Cmty. v. State of Ariz.*, 50 F.3d 734, 739 (9th Cir. 1995*); see also Barona Band of Mission Indians v. Yee*, 528 F.3d 1184, 1192 (9th Cir. 2008) ("the federal government's interest in Indian economic vitality does not alone defeat an otherwise legitimate state tax."). Indeed, the Ninth Circuit has declined to find federal preemption of state taxation even where the tribal enterprise subject to taxation was constructed "wholly from federal funds." *See Gila River II* (rejecting preemption claim despite substantial federal funding, as noted in *Gila River Indian Community v. Waddell*, 967 F.2d 1404, 1410 (9th Cir. 1992) ("*Gila River I*")).

Furthermore, even if the federal government's interest in tribal economic development were, without more, a factor that tipped the scales in favor of preemption, the taxes at issue in this case demonstrably have not impeded this interest. The taxes do not interfere with or in any direct, measurable sense reduce the lease payments the Tribes will continue to collect from businesses at QCV, or other revenues collected from Indian-run businesses within the Village, which Defendants established at trial are substantial. Who collects the taxes likewise does not have a direct, measurable effect on tribal employment at QCV, or on the sustainability of tribal- and member-owned businesses that support activity at the Village, or on any of the other factors driving Tulalip's economic development.

Tulalip is by all accounts in excellent financial health. *See* Menenberg Report, Ex. S-579. Evidence presented at trial does not support a conclusion that the federal goal of economic

development on the reservation generally, and at Quil Ceda Village in particular, has been hindered by the State and County taxes at issue in this case. As Plaintiffs have acknowledged, "Tulalip has dramatically fulfilled the core federal goals of encouraging tribal self-determination and economic development," despite collection of State and County taxes from the very inception of QCV. Tulalip Trial Brief at 1.The federal interests at stake in this litigation do not weigh in favor of preemption.

       2. *Tribal Interests*

Tulalip has legitimate and substantial sovereign interests in the development and operation of Quil Ceda Village. At trial, Plaintiffs presented evidence supporting their claim that employment of Tulalip members and economic independence of the Tribes were the primary factors driving development of Quil Ceda Village. The Tulalip unemployment rate in the 1970s was 76%, with many members subsisting on fisheries and timber income. Tr. at p. 361; *see also* Tr. at p. 289. Today, Tulalip's unemployment rate, which had fallen to 26% by 2000, now stands at 6-7%, due in large part to the success of Quil Ceda Village, and Tulalip's concerted efforts to harness that success to provide employment and career opportunities for its members. *See, e.g.* testimony of Teri Gobin, Tr. at pp. 361, 390. The parties have stipulated that altogether, "Tulalip's development and ongoing operation of Quil Ceda Village has provided employment opportunities to hundreds of Tulalip tribal members." Ex. T-1223, SF 511. These members are employed in fields such as "government administration and services, technology and telecommunications, public utilities and maintenance, and gaming and hospitality, as well as opportunities for Native-owned and tribally owned small businesses in areas such as retail, construction, contracting, and maintenance." *Id.*

However, under the *Bracker* line of cases, a tribe's interest cannot be, and has not been, defined with unlimited breadth. The preemption inquiry here must be one into the Tribes' interests specifically *in the activity subject to taxation*, and whether the challenged tax "interferes or is incompatible with" those interests. *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334; *see also Barona Band of Mission Indians v. Yee*, 528 F.3d 1184, 1191 (9th Cir. 2008) (examining whether "Tribal interests are implicated by the imposition of the California tax."). It bears repeating in this context that the taxes at issue in this case are not on the Tribes' efforts in developing Quil Ceda Village, on the construction of buildings or

15

infrastructure, on the operations of the Quil Ceda Village government, or on the Tribes'
activities supporting maintenance of the Village.

    The Court also rejects the Tribes' argument that the taxes here are on an "experience"
or on "activities" it provides at Quil Ceda Village, similar to the states' exercise of authority
over sporting and cultural activities in *Cabazon Band* and *Gila River I. California v. Cabazon
Band of Mission Indians,* 480 U.S. 202, 219 (1987) (regulation of bingo gaming); 967 F.2d at
1410 ("In this case, the Tribe alleges active involvement in the production of the entertainment
events which take place on its reservation. . . . it continues to work closely with those
companies to ensure that they provide high quality entertainment to the public."). The State
and County impose the taxes at issue on commercial activities at the Village, just as they do on
similar transactions throughout the State of Washington and Snohomish County, respectively,
without regard to any "experience" the Tribes may incidentally be providing. The taxes here
are paid by non-Indian customers on non-Indian goods imported from off the reservation, and
on the "privilege of doing business," which the non-Indian businesses, not the Tribes, enjoy.
The imposition of state taxing authority at issue here is not on the Tribes' "active role in
generating activities of value on its reservation," but on the value of the non-tribal goods being
sold, and the Tribes' interest is therefore at a minimum. *See Yavapai*, 117 F.3d at 1112 ("*Salt
River* and *Gila River II* both teach that the Tribe must have "an active role" in the creation of
the value taxed in order to establish preemption.").

    Properly viewed in this light, the only tribal interest the State and County taxes actually
"interfere or are incompatible with" is the Tribes' ability to collect the full measure of its own
sales tax from the non-Indian businesses at QCV. None of the other proffered Tulalip
interests—in tribal employment, in the Tribes' ability to make decisions affecting QCV
development, in collection of a percentage of Cabela's revenues—are "implicated" by which
party, State or Tribal, collects sales tax. At bottom, the Tribes' sole interest in the collection of
taxes at QCV is financial. This is a valid, important interest; but it is not one courts have found
tip the balance under *Bracker* in favor of preemption. *See Barona Bands*, 528 F.3d at 1191,
*citing Crow Tribe of Indians v. Montana*, 650 F.2d 1104, 1116 (9th Cir.1981) ("It is clear that a
state tax is not invalid merely because it erodes a tribe's revenues, even when the tax
substantially impairs the tribal government's ability to sustain itself and its programs."). This is

true even if collection of the State and County taxes precludes the Tribes' ability to collect its own measure of taxes at QCV. *See Ute Mountain Ute Tribe v. Rodriguez*, 660 F.3d 1177, 1198 (10th Cir. 2011), *citing Cotton Petroleum*, 490 U.S. at 186–87 ("[T]hese indirect economic burdens on the Tribe's ability to increase its own taxes and attract new leases are akin to the indirect burdens that the Supreme Court dismissed in *Cotton Petroleum*. . . . the ability of the Tribe to increase its tax rate" are impacts that are "simply too indirect and too insubstantial to support [a] claim of pre-emption.").

Even if the inquiry under Bracker were one into the Tribes' interests in the broadest possible sense, the necessary conclusion would still be that these interests do not weigh in favor of preemption. The transactions at issue are between non-Indian parties and the goods are produced off-reservation by non-Indians. Language from Ninth Circuit cases suggest this fact alone is fatal to the Tribes' claims. *See, e.g., Salt River Pima-Maricopa Indian Cmty. v. State of Ariz.*, 50 F.3d 734, 737 (9th Cir. 1995) ("When state taxes are imposed on the sale of non-Indian products to non-Indians, as is the case here and in the so-called "smoke shop" cases, the preemption balance tips toward state interests."); *see also Colville*, 447 U.S. at 155–57 (The tribal "interest is strongest when the revenues are derived from value generated on the reservation.").[7] As in other cases in which courts have declined to preempt state taxes, here the Tribes has minimal oversight over the management or operation of the non-Indian businesses at Quil Ceda Village, a fact that weighs heavily against preemption. *See Gila River II* ("There is no evidence to support the statement that the Tribe works closely with [the taxed businesses]. . . . The Tribe's role is limited to providing clean and safe facilities."). While the development and government of Quil Ceda Village has provided—and regardless of the outcome of this case, will continue to provide—valuable employment to tribal members, as in *Gila River II*, few Tulalip members are employed by the businesses subject to taxation. Ex. T-1223, SF 512. Finally, the record reflects that Tulalip receives a percentage of revenues from

---

[7] Tulalip attempts to escape the shadow of *Colville*, urging a narrow reading of the *Colville* Court's reasoning. It emphasizes that the Tribes' interest in QCV is far more than one in marketing a tax haven (which it does not do), a factor the Supreme Court found so offensive in *Colville*. 447 U.S. at 155. But the Ninth Circuit has rejected this narrow reading, noting that in *Colville* the off-reservation origin of the products being sold was an independently sufficient justification for rejecting the tribe's preemption claim. *See Salt River*, 50 F.3d at 738.

only one non-Indian-owned business at Quil Ceda Village, Cabela's, and neither the fact nor the amount of this payment is tied in any way to who collects taxes. Under circumstances similar in every material respect to these, not a single court to date has found a state's authority to tax is preempted by federal law.

### 3. State/County Interests and Services Provided to Taxpayers

The final interests the Court must examine under *Bracker* are the interests of the State and County implicated by the taxes at issue in this case. The primary interest asserted by both the State and Snohomish County is an interest in raising revenue, which courts have routinely found to be "a legitimate state interest." *Barona Band of Mission Indians v. Yee*, 528 F.3d 1184, 1192–93 (9th Cir. 2008), *citing Crow Tribe of Indians*, 650 F.2d at 1113 ("Of course, revenue raising to support government is a proper purpose behind most taxes."). Indeed, in contrast to the revenue-raising interests of the Tribes, the State and County's interests are at their "strongest" here, where "the tax is directed at off-reservation value." *Salt River*, 50 F.3d at 737.

Of particular importance in this case is that the taxes at issue "bear some relationship to the activity being taxed." *Hoopa Valley Tribe v. Nevins*, 881 F.2d 657, 661 (9th Cir. 1989). The *Bracker* preemption analysis counsels an examination of the services provided to the party who pays the tax, who in this case are non-Indian customers at Quil Ceda Village (sales tax) and the non-Indian businesses themselves (B&O and personal property tax). The basic question regarding provision of government services is whether the taxes being challenged are justified by provision of services to the taxpayers. *See Ute Mountain Ute Tribe v. Rodriguez*, 660 F.3d 1177, 1199 (10th Cir. 2011), *citing Bracker*, 448 U.S. at 150 ("In order to justify a state tax on non-Indian actors operating on Indian land, the State generally must be able to show that it 'seeks to assess [the] taxes in return for governmental functions it performs for those on whom the taxes fall.'"). In particular, courts are to look for "a nexus between the taxed activity and the government function provided." *Barona Band*, 528 F.3d at 1193.

At trial, Tulalip and Quil Ceda Village demonstrated that they provide many of the government services available to the taxpayers while they are within the Village, including in particular to the QCV businesses, which reside there. These services include law enforcement, fire protection and emergency medical services, and utilities and road maintenance, at an

estimated annual cost to the Tribes of $12-13 million. Ex. U-153, Expert Report of Jason Bass, p. 12*; see also* testimony of Joseph Kalt, Tr. at pp. 710-11 ("[T]he Tulalip Tribes have -- are providing, continue to provide . . . the full list of municipal governmental services that you would expect a municipal government to be providing.").

The Defendants have also established, however, that both Tulalip and its members, and the taxpayers at issue in this case—the QCV customers and businesses—regularly rely on services provided by the State and County as well. Perhaps most essentially, in the 2015-17 biennium, Washington spent approximately $20 billion, raised primarily by the State sales and B&O taxes, on K-12 public education within the State. *See* Ex. S-26. The Washington public education system includes four public schools located on the Tulalip reservation, serving 710 Tulalip students. Ex. S-26 at 9; Ex. T-1240, SF 931; *see generally* testimony of Dierk Meierbachtol, Chief Legal Officer with the Washington Office of Superintendent of Public Instruction, Tr. at pp. 1413-45. Furthermore, it is reasonable to conclude that many of the employees and customers have been educated by the Washington public school system to at least some extent. Without question, all operations at Quil Ceda Village derive substantial, critical benefits from the high-quality public education Washington provides. *See* Bajaj Report, Ex. S-605.

In addition, approximately 17% of Washington's General Fund—$3.4 billion in 2017— goes towards funding social and health services within the State. *See* Decl. of Judy Fitzgerald, Chief Financial Officer, Washington State Department of Social and Health Services, Ex. S-611, ¶7. These services include payments to Temporary Assistance for Needy Family and Basic Food assistance programs, and support for nursing homes, intermediate care facilities, and juvenile rehabilitation services. *Id*. ¶8. An additional $4 billion from the General Fund provides Medicaid health coverage, and nearly $1 billion supports the State's correctional system. *See* Decl. of Megan Adkinson, Chief Financial Officer for the Washington Health Care Authority, Ex. S-598, ¶6; Decl. of Julie Martin, Department of Corrections, Ex. S-590, ¶14. Washington also funds and administers programs and enforces regulations related to workplace safety, worker's compensation, unemployment insurance, business licensing, and consumer protection. Such services are generally available to customers and businesses at Quil Ceda Village. Ex. S-609, SF 521; Ex. S-609, SFs 516-18; Ex. S-612; RCW 19.86.080. The

Washington State Patrol patrols the stretch of the Interstate 5 highway, which the State owns and maintains, that borders the reservation and Quil Ceda Village. Tr. at p. 1288-89; Tr. at p. 1191. The necessity of these and other State-provided services to a civilized society generally, and operations at Quil Ceda Village specifically, cannot be reasonably disputed. *See* Bajaj Expert Report, Ex. S-605. ("[B]usinesses need a high-quality business environment, including a well-educated workforce, good telecommunications and transportation infrastructure, well-functioning regulatory systems, an efficient court system and a well-functioning legal system, and enough potential customers with sufficient buying power.").

Snohomish County also provides countywide services that are available to Quil Ceda Village businesses and customers, and the Tulalip Tribes. For example, although the Tulalip Police Department serves as the primary law enforcement agency on the reservation and within the Village, the Snohomish County Sheriff's Office provides additional law enforcement support both within and surrounding Quil Ceda Village and the Tulalip Reservation, including access to the 911 emergency call system, Search and Rescue resources, and background checks for pawned gun sales and pistol transfers. Ex. C-179, SFs 1155, 1158; C-183, ¶ 5; C-176, ¶ 9; C-177. Services provided by the Snohomish County District Court and Snohomish County Superior Court are available to businesses, residents, and visitors to the Tulalip reservation and Quil Ceda Village, just as they are to Snohomish County residents and visitors generally. *See* Exs. C-164, C-165, C-199. Snohomish County also maintains a Medical Examiner's Office, which between 1999 and 2015 tracked 562 deaths within the Tulalip reservation, plus ten at Quil Ceda Village. Ex. C-189; Ex. C-190, SFs 1100, 1101.

Undeniably, Plaintiffs provide many of the government services available within Quil Ceda Village. Given the litany of services Defendants also provide, however, the Court declines to wade into the impossible task of weighing the relative value of what are patently unquantifiable services provided by the parties. It is sufficient under *Bracker* and progeny to conclude that "[t]his is not a case in which the State has had nothing to do with the on-reservation activity, save tax it." *Cotton Petroleum Corp.*, 490 U.S. at 186 (finding state tax not preempted where state provided some services available to taxpayers); *see also Ute Mountain Ute Tribe v. Rodriguez*, 660 F.3d 1177, 1199 (10th Cir. 2011) ("In *Bracker* and *Ramah*, the Court noted that it was 'unable to identify *any* legitimate regulatory function or service [that

the state] performed ... that would justify the assessment of [the] taxes.'") (citations omitted, emphasis in *Ute Mountain Tribe*).

As outlined above, both Washington and Snohomish County provide a substantial portion of services that support Quil Ceda Village and the Tulalip reservation, in the form of public education, health and human services, maintenance of roads, and law enforcement and justice systems. Defendants also supply these and other services to the taxpayers living outside the Tulalip reservation that enable them to travel to QCV and engage in the commercial transactions related to the taxes at issue. These services more than justify imposition of the taxes at issue. Nothing in the case law requires an examination closer than this. *See Yavapai-Prescott Indian Tribe v. Scott*, 117 F.3d 1107, 1116 (9th Cir. 1997); *Gila River II*, 91 F.3d at 1239 ("The Tribe's insistence that there be a direct connection between the state sales tax revenues and the services provided to the Tribe is similarly meritless. As observed in *Salt River*, the Supreme Court has noted that there is no requirement that a tax imposed on non-Indians for reservation activities be proportional to the services provided by the State.").

The Court finds that the State and County's interest in raising revenue, particularly in light of the fact that they provide many of the services to the taxpayers related to the activities being taxed, weighs decisively against preemption.

### 4. The Balance of Interests Does Not Justify Preemption of State and Local Taxes

Having applied the law gleaned from cases invoking a *Bracker* analysis to the evidence produced at trial, the Court finds that the taxes at issue in this case are not preempted by federal law. The most relevant factors are that (1) there is an absence of a "pervasive" and "comprehensive" federal regulatory scheme governing the taxed activity; (2) transactions subject to tax are between non-Indian parties, involving goods produced off-reservation; (3) Tulalip has been unable to demonstrate more than a financial interest implicated by State and County taxation; (4) the State and County have a substantial interest in enforcing generally applicable taxes within their borders; and (5) the State and County have not abdicated their responsibility for providing services to Tulalip or the taxpayers in exchange for those taxes.

### B. Plaintiffs' Tribal Sovereignty Claim

Courts have repeatedly observed that interference with tribal sovereignty poses an independent barrier to state and local taxation on tribal land, but there is little case law offering

guidance on how a tribe's sovereignty claim should be evaluated. Existing law, however, counsels against a finding that the collection of taxes at issue in this case infringes on tribal sovereignty. First, Tulalip's sovereignty interests here are at a minimum, where the taxes in question are keyed solely on goods manufactured off the reservation, and on transactions between non-Indians. *Colville*, 447 U.S. at 157. Second, as outlined above, the only sovereignty interest being impeded in this case is the Tribes' ability to collect the full measure of its own taxes—an interest that is essentially little more than financial. While this interest is valid, there is no evidence in the record that the State and County collection of taxes here has impeded the Tribes' ability to thrive financially. *See* Menenberg Report, Ex. S-579. The governments of the Tulalip Tribes and the Consolidated Borough of Quil Ceda Village have also thrived, irrespective of the imposition of State and County taxes, as Tulalip's experts and others testified at trial. *See* testimony of Joseph Kalt, Tr. at p. 703 ("Tulalip Tribes, through their undertaking of the Quil Ceda Village development and governance, represent a prime example, actually, of economic success and development under federal policies of self-determination.").

Perhaps most tellingly, Plaintiffs have been unable to point the Court to a single case upholding a tribe's sovereignty claim in the wake of a failed *Bracker* preemption claim. This case is not one for setting such a precedent. The taxes at issue are not taxes on tribal businesses, on tribal goods, on tribal members, or on tribal government. These taxes have interfered only, as the Court has already observed, with the Tribes' ability to collect the full measure of its own taxes at Quil Ceda Village. Not a single modern case has found an infringement of tribal sovereignty under similar circumstances. The Court does not do so here.

## IV.    CONCLUSION

Tulalip has spent the last several generations developing, constructing, and maintaining one of the premier commercial and retail destinations in Western Washington. These efforts have produced rewards in the form of revenues from leases and from the Tulalip-owned businesses at QCV. Tulalip now seeks to enhance those revenues by replacing the State and County taxing authority with its own.

The case law dictates that the path to preemption of state general taxation authority is a narrow one. In the absence of an extensive federal regulatory scheme governing the activity

being taxed, Supreme Court and Ninth Circuit precedent has all but closed the door on preemption of a state's generally applicable tax on activities between non-Indians, concerning non-Indian goods, on an Indian reservation, particularly where the State has not "abdicated" responsibility to the tribe and continues to provide government services to the taxpayers in question. Not a single case has found preemption under facts materially similar to those here, and none of the cases has suggested a justification for preemption in such circumstances, or issued an invitation to create one.

For the foregoing reasons, the Court hereby finds in favor of Defendants on all claims, and dismisses this case.

Signed this 4th day of October, 2018.

Barbara Jacobs Rothstein
U.S. District Court Judge